**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**ELIZABETH LINDSEY,**

     **Plaintiff,**

**v.**                                                                                    **24-cv-00393-GBW-JFR**

**ALBUQUERQUE PUBLIC SCHOOLS**

**BOARD OF EDUCATION,**

**MELANIE BLEA, in her individual capacity,**

**Defendants**

## PLAINTIFF'S SECOND MOTION TO COMPEL, FIRST MOTION TO SHOW CAUSE AND FOR RULE 37 SANCTIONS.

COMES NOW, Plaintiff Elizabeth Lindsey, by and through her counsel of record, Heather Burke, with her Second Motion to Compel, First Motion to Show Cause, and for Sanctions.

### Background

Plaintiff first requested discovery on September 20, 2024, which was due on October 21, 2024. Included in those requests, were several requests involving production of emails and other documents. Defendants did not object to the form Plaintiff requested that the documents be produced in, nor did they state that a confidentiality order was needed for any responsive

1

documents in their response to discovery.  The first informal discovery conference was held on

November 21.  It wasn't until December 6, 2024, that Defendants first raised the issue of a

confidentiality order, stating that responsive FERPA protected IEP information would be

produced that needed to be protected. until a letter to undersigned counsel on December 6.

 Undersigned counsel questioned whether there should be responsive records which would

contain FERPA information, but agreed to a confidentiality order to protect it in the event there

was overlap.  When Defendants finally circulated their proposed confidentiality order, it was

extremely broad, seeking to include anything which might be considered non-public under IPRA.

They restated this need in the joint position statement for the 2nd informal discovery conference.

In that joint statement, they said

> As APS communicated to Plaintiff's counsel in its December 6 letter, it has
> identified email communications sent to or received from Plaintiff's APS email
> address from January 2020 to present, which are voluminous and raise FERPA
> concerns. APS is ready to produce upon entry of a confidentiality order.

This Court narrowed the scope to the FERPA protected information. The confidentiality order

was entered January 3, 2025.

Defendants, pursuant to the Court's order, produced the records they were purportedly

withholding based on the confidential documents on January 20, 2025. In that production

Defendants produced about 4,413 files comprising 16,219 pages of non-searchable poor quality

pdf documents marked as "confidential" instead of producing the records in native format as

requested. They also produced an additional 6,615 files comprising 18,994 pages of non-

2

confidential documents[1].  This results in a total of **11,028** documents comprising **35,213** pages just from the January 20, 2025 production. Nearly all of the 16k confidential documents are wholly irrelevant, non-responsive and needlessly include children's FERPA protected info.  Few of the nearly 19k non-confidential documents are relevant.

The non-confidential production includes multiple copies of MAP testing packets for at least one student that clearly should be confidential. 3 full copies of the 147 page 22-23 teacher's union contract that is not responsive to any request.  It also includes multiple copies of the 194 page FEMA "introduction to the incident command system" which also would not be responsive to anything in this litigation.  It is pretty clear that Defendants just produced anything with the word "Beth" in it.

Undersigned counsel requested that Defendants produce discovery in the form in which it had been requested, which was its original form. The vast majority of these documents produced also appeared to contain the private IEP information of APS students, which is not at all relevant in this lawsuit.  Defendants position statement for the 3rd informal discovery conference, they admit this, stating "Defendants advised at the aforementioned conference that it was processing over 12,000 emails and attachments given the broad search terms requested by Plaintiff's counsel. Additionally, Defendants advised that the **vast majority** of those emails **contained correspondence about student Individualized Education Programs ("IEPs")** given the nature" (emphasis added) [EX 1]

At the 3rd informal conference, this Court was told by Mia Lardy that the reason for this production was the fault of Plaintiff's "broad search terms", and the allegedly overbroad search

---

[1] This does not include the excel documents which they produced in native form for both

terms she sought.  Ms. Lardy stated to the Court specifically that the word "accommodation" resulted in many thousands of records, specifically IEPs.   The Court even chastised Plaintiff's counsel stating that Plaintiff was violating the spirit of Rule 26 with her overly broad requests. Undersigned counsel attempted to explain that Plaintiff had never sought this kind of information and it was way beyond the scope of anything in this litigation. She stated that there was absolutely no reason for children's private IEP information to be produced in discovery in this case, and that she had no business viewing such records.

Ms. Lardy represented that she would again use their e-discovery software to search the same files they already produced, with more restrictive search terms to narrow the production. She also suggested that Defendants should "claw back" their previous production, suggesting that Defendants were concerned about how much data was being used up by it.  She represented to the Court that the documents were not in .msg or .pst format and that Defendants had them in .pdf format, and claimed that they must be able to produce them that way.   This Court also ordered counsel to confer with Defendants paralegal who conducts their e-discovery searches. Undersigned counsel was told by the paralegal that she receives a .pst file on which she runs the search and then turns those records into pdfs.

Defendants produced a much smaller number of documents on February 7, 2025, numbering only 3, 997 pages of allegedly responsive information.  As described herein, this production contained many completely different documents, and still hundreds if not thousands of pages of duplicative and/or irrelevant records.  Defendants produced emails in random chains instead of individually, so the same emails appear repeatedly and it's impossible to determine whether the entire chain has been produced.  Metadata is incomplete and only includes the last email in a chain, not the metadata for the entire chain.  However, as discussed herein, the

4

metadata proves that Defendants have modified the records and converted them from the requested native form, into .pdf form.  They continue to refuse to produce documents in the form in which they were created and are kept, and insist on endless "conferences" which do nothing but continue to increase the cost of litigation.  Defendants continue to repeatedly misrepresent the discovery production in this case.

## ARGUMENT

This Court renders case affecting decisions, whether formally or informally, based on the representations of parties and their counsel.  When those representations have no basis in truth, the Court can be unknowingly manipulated into decisions which it would not otherwise have made. Defendants' obstructive actions in this case make the case oppressively burdensome to prosecute. Parties in this case do not have equal resources at their disposal, and Defendants can long outlast any individual Plaintiff, especially when they may have an improperly undisclosed insurance policy funding some or all of their defense.

### Failure to disclose insurance policy

Under Rule 26(a)(1)(A)(iv) "for inspection and copying as under Rule 34 , any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment."

This case has been ongoing since August 2023, and was removed to federal court on April 26, 2024.  Defendants Initial disclosures were served June 6, 2024.[  For the first time, during a good faith conference regarding other discovery issues, Ms. Lardy revealed that Defendants are only self pay up to a certain amount, and then have an insurance policy for claims above that amount.

Their initial disclosure says "Defendant APS is self-insured in an amount sufficient to satisfy a potential verdict in this matter and does not carry an insurance agreement which meets the criteria set forth in Rule 26(a)(1)(A)(iv)." [EX 2]  It's unclear upon what they based this decision to not disclose the insurance policy they actually do have.  Even if they believed at the time that the claims would not exceed whatever the dollar threshold is, when they received Plaintiff's first demand letter on October 3, 2024, they had full knowledge of what Plaintiff believed her claims may be worth, and it was an amount which is almost certainly over the threshold.

Defendants chose to cancel mediation while they got more discovery, and in the meantime, the costs of this litigation have risen exponentially, as is often the case.  Yet they still have not disclosed their insurance policy.  Instead, they seem to expect that Plaintiff can cut her damages and costs and make them an offer under whatever that mysterious threshold is, while they continue to obstruct and drive up the cost of this litigation.  Settlement discussions in this case have gotten nowhere because Defendants appear to now consider themselves limited to a dollar figure unknown to Plaintiff and long since surpassed by the abusive and obstructive litigation tactics described herein.

## Good Faith Conference

Courts require parties to engage in good faith conference in an attempt to resolve discovery issues before motion practice, or in this case, before engaging in this Court's informal resolution procedure.  Plaintiff has repeatedly attempted to do just this, but has been met with obstruction and misrepresentation at every turn.  It is impossible to have a good faith conference without good faith being present for both parties.  This has significantly driven up the cost of this

case which prejudices Plaintiff who does not have the nearly limitless resources that Defendants do.

## Abuse of Confidentiality order

In the 2nd discovery conference, Defendants misrepresented Plaintiff's discovery requests, claiming that Plaintiff had requested all emails sent by or to her, to justify the need for a confidentiality order to protect FERPA information.  However, Plaintiff never requested all emails she sent or received.  Plaintiff requested "Any and all emails, text messages, and/or documents sent to or returned by Plaintiff **involving or in any way related to her disabilities and/or FMLA.**"  [Ex 3] This would never include student's private information.  However, after delaying discovery to have a confidentiality order entered, Defendants produced over 16k pages of poor quality non-searchable, completely irrelevant documents labeled confidential containing student's private information.

Defendants most recent production of allegedly responsive evidence contains NO FERPA protected information.  This is correct and proper because FERPA protected information has no place in this litigation and never should have been produced.  Defendants intentionally insisted on a confidentiality order so that they could produce students' FERPA protected records to obstruct and delay this case.  They forced Plaintiff and this Court to spend unnecessary time arguing, briefing and/or reviewing confidentiality agreements to protect records which never should have been produced at all and were never responsive to any of Plaintiff's requests.   There could not have been a good faith belief that any of those documents were relevant or responsive with even a minimum amount of required diligence.

**<u>Meta data and Native Format</u>**

Plaintiff properly requested discovery be produced in original native format with original metadata preserved.  This is the format in which those records were created and maintained. Defendants have abjectly refused to produce discovery in the requested form.  In the 3rd informal discovery conference, Ms. Lardy represented to the Court that the documents were already in pdf form and/or that converting them from their native form to pdf, and thereby modifying every file, was somehow necessary and reasonable. She argued in her position statement for the 3rd informal discovery conference that "The emails' native format is not readily accessible…" knowing that that was the form in which they already had the emails.  [Ex 1]

The paralegal working on the discovery confirmed that she is provided a .pst of emails which she processes with their discovery software.  Instead of producing those emails in .msg or .pst, Defendants have modified every document produced, except Excel documents, stripping relevant and discoverable information such as creation dates, file names, thread information and other important information.  Defendants clearly know how to produce native files and still bates stamp them.  [Ex 4]

There is no legal basis for allowing modification of evidence before it is produced, particularly when that modification both removes evidence but makes it more difficult to review. Defendants again produced discovery in pdf format, but this time with supposedly retained metadata.  But they didn't produce each email, and instead produced them in threads, with the metadata only for the last email (first page) of the purported thread.  But not every email in the

8

thread is produced, and in that form it is impossible to determine whether there are emails missing from the thread.

The metadata spreadsheet, despite not including all metadata, proves that Defendants documents were in the native form Plaintiff requested until Defendants modified them by converting them into pdf.  [Ex 5] Exhibit 4 shows several columns from Defendants metadata spreadsheet, including the original file types.  Plaintiff specifically requested emails be produced in .msg format, and there is no dispute that Defendants had these emails in .msg format, and converted them to .pdf.   Ms. Lardy admits in her more recent emails that she is converting native files into .pdf before producing them. [Ex 6] Ms. Lardy maintains that Defendants are allowed to modify evidence for labeling, redacting, confidentiality, and to "keep track" of what they are producing.  There is no basis to these claims, and ultimately, defendants have marked no documents confidential in the most recent production or redacted anything.  Even if they had that would limit the need to those specific documents, not ALL of them.   Plaintiff has never agreed to receive modified evidence.

Unfortunately, they also produced entire chains of emails as a single pdf, only retaining the metadata from the very last one. The metadata produced in an excel spreadsheet is incomplete, and the fact that it shows that Defendants last modified the files on November 15, 2024, evidences that they did not properly preserve the metadata.  What the metadata also shows is that the files requested by Plaintiff were in the form that Plaintiff requested them before Defendants converted them to pdf.  Plaintiff requested these files in the form in which they are ordinarily kept and Defendants have stripped them of their original metadata, modified them and produced only some of them.

9

**Material Misrepresentations and Obstruction**

After the confidentiality order was entered, Defendants were directed to produce the documents withheld by January 20. On that date, Defendants produced 16k pages of confidential non-searchable pdf records, nearly all of which contained irrelevant IEP related info. This information did not need to be, and should not have been disclosed in this case. They also produced 18, 994 pages of non-confidential non-searchable pdf documents. That's over **35,000** nearly completely irrelevant documents produced in this case. Their response to RFP 4 indicates that they are claiming that over 135,154 pages are responsive to it. [Ex 3]

In the 3rd discovery conference, Ms. Lardy made material misrepresentations to this Court to convince it that it was reasonable for Defendants to produce files as pdf instead of their original form. This Court relied on these representations when it opined that production of pdf documents might be reasonable. She misrepresented the fact that the 35k pages of documents had any legitimate basis, and claimed that the word "accommodation" was to blame. She intentionally made it sound as though Defendants would search those 35k documents for the responsive records and produce those so that Plaintiff would not have to. She knew, or should have known, that Defendants had made no attempt to produce responsive records and purposefully, in response to this Court's order, produced over 16k pages of confidential documents she knew contained children's private IEP information, which she claimed was the majority of that production. This intentionally used children's private information as an obstructive tactic. None of those records were produced in the 2nd batch because they were not, in fact, responsive at all.

She also represented that Defendants had already used their e-discovery software for that production and that she would search those 35k pages and narrow the searches to produce responsive records. She could not have done that because the records they produced are not found in the 16k documents. She knew, when stating otherwise, that the 16k documents were intentionally NOT responsive.

The 2nd iteration of discovery has mostly completely different records from the first iteration demonstrates that the first iteration didn't have responsive records and Defendants had to pull those again. This means that Defendants intentionally wasted Plaintiff's and this Court's time to enter a needless confidentiality order just to protect them from liability for abusively producing children's records to obstruct and delay Plaintiff's discovery. The newly produced records are not only different than what was produced in response to this Court's order on Jan 20, but the quality is better, likely because they weren't printed first. Ms. Lardy represented to the Court that she would be searching the huge production and narrowing it. Both the old and the new production are rife with many multiples of the exact same documents, frequently not even responsive to any of the search terms other than Plaintiff's name.

Although it took about dozens of hours just to prepare to review, undersigned counsel processed Defendants first production. Not surprisingly, her initial observations about the data proved correct. Defendants had intentionally produced thousands upon thousands of pages of private and irrelevant IEP records. Out of the 16, 219 pages of confidential records, the word "accommodation" only showed up 79 times. [Ex 7] Notably, none of those hits pertained to the accommodations requests for Ms. Lindsey but were about students. In the non-confidential records, it's even worse. That word shows up only <u>eight</u> times. [Ex 8] In 35,213 pages, the word "accommodation" shows up only 87 times total, which is a 0.002% hit rate. Yet Ms. Lardy

11

told this Court and Plaintiff at the hearing, that it was this word that resulted in so many pages being produced. [Ex. 1, 6]

Conversely, in the newly produced documents, "accommodation" appears 321 times. [Ex 9] Ms. Lardy has represented both to this Court, and several times to Plaintiff, that the new production was merely a filtering of the old production.  This shouldn't be true if the number of hits for the word "accommodation" is nearly 400% more in only 4k documents, compared to 35k.  This means the new documents are not the same as the old documents, whether due to extreme duplication or because new evidence has been included that wasn't in the original 35k documents.

In the new production, Defendants produced a variety of email chains including an August 1, 2023 email from Plaintiff stating, in part "I have a history of elevator access as an ADA accommodation Please let me know if we need to meet and re-document that accommodation."  While responsive, this 4 page email is duplicated 42 times in the 3994k recently produced pages, so comprises approximately 168 of those pages. [Ex 10]   Conversely, this email doesn't appear a single time in the 35,213k pages originally produced which supposedly were so numerous because of the word "accommodation."   Ms. Lardy could not have gotten these emails from the same original production and this email is not an example of her "narrowing" the larger production, contrary to her repeated representations otherwise.

Similarly, the name "Socorro" resulted in only 3 hits in the 16k confidential documents [Ex 11], and 435 in the 18k non-confidential documents.[Ex 12]  That's 0.01% of the pages. Yet, this name has 545 hits in less than 4k recently produced documents, which means it's nearly 14% of those. [Ex 13]  If Ms. Lardy's representations were true, filtering the 35k documents would result in the same, or less hits, not more.  This analysis is further complicated by the

12

number of duplicate documents produced which makes it difficult to determine if the increase is solely the result of those duplicates. However, there are emails produced in the second batch that do not appear anywhere in the original 35k pages.

The new production is filled with numerous unnecessary duplicates. This obscures how many actually responsive records have been produced, and creates the illusion that Defendants are making a solid effort to locate evidence. For example, a 3-page email chain called "Licensure renewal" from 2020 was produced 152 times. [Ex 14]   That means 456 pages of the 3997 pages are JUST this email. Worse, it doesn't even appear to be relevant or contain any of the search terms discussed. [Ex 15]  When asked why there were 18 duplicates of another irrelevant pdf document, Ms. Lardy responded with a confusing story about the number of attachments being dependent on the number of email recipients. That an email may have been sent to a group should not determine the number of times it is produced. It remains a single email, and that is particularly true for the attachment. And even if this made sense at all, producing an irrelevant email string 152 times has no justification at all.

Because Defendants modified the filenames of the attached files, it's impossible to even determine what that pdf document was attached to.   This Court can see, looking at the metadata spreadsheet exhibit that Rows 32-47 are all the same pdf [Ex 16] This pdf doesn't has the name "Valerie Hoose" but that name is supposed to be a sender or a recipient, not merely mentioned and the word "balance" is clearly about money, not disabilities.  Even if this pdf were responsive, there's no justification to have produced in 15 times, particularly in a row. [Ex 17] These are the kinds of things which should be easily avoidable.

Meanwhile, directly relevant emails, which counsel was even a party to, and which include the search terms such as "accommodation" and are to "Socorro Rodriguez", have not

13

been produced. [Ex 18]   NO emails from the March 2024 ADA discussions or decisions appear to have been produced at all, and attempts to confer about the huge gaps in time have gone nowhere. Undersigned counsel stated in a good faith email on February 24, 2025 that "I have noticed there's big faps in responsive email dates, particularly around the time of the most recent interactive process meetings."  And Ms. Lardy obstructively replied "I do not know what you mean by 'big gaps' in responsive email dates." and "If you can let me know what date ranges you are referring to, that would help." The most recent interactive process meetings were held in March 2024, which is clearly established in the facts of this case.

No emails involving Laura Castille, the attorney who appeared to be working with the ADA office on the most recent non-accommodation denial have been produced, even though these emails are unlikely to be privileged because reasonably accommodating an employee is a business decision normally made by non-attorneys.  Those including undersigned counsel would not be privileged at all. They have produced no privilege logs or otherwise disclosed that they are withholding otherwise responsive evidence on the basis of privilege, so clearly they are not making that claim about them. It is clear that opposing counsel is making little to no effort to address deficiencies.

Plaintiff has spent tens of thousands of dollars on discovery, while Defendants have completely refused to produce any evidence of their reasons for making the accommodations decisions in this case.  This is tantamount to trial by ambush.  Defendants have objected when we have sought this evidence in interrogatories, they have failed to produce documents containing any information in respond to RFPs and instead produced tens of thousands of pages of documents they knew were irrelevant.  They've even tried to suggest that Defendant APS can't testify about its own decisions in this case because they are somehow not "reasonably

14

accessible" to it, after repeatedly arguing to Plaintiff and this Court that Plaintiff's interrogatories were more properly asked in a deposition. Even that issue remains unresolved because Ms. Lardy wanted to "think" about whether APS could testify about its own decisions. This Court cannot allow such obvious and prejudicial obstruction to continue.

**2nd Discovery requests**

As discussed at the 3rd informal discovery conference, Defendants made blanket numerosity objections to the interrogatories in Plaintiff's 2nd discovery requests. Perhaps more importantly, they also failed to produce discovery in the form requested, and didn't even apply their e-discovery searches to those records or produce any metadata, so it's like Plaintiff is starting from square one again. When undersigned counsel has tried to resolve these issues, both Ms. Lardy and Ms. Chrissman, wish to painstakingly engage in additional discussions, briefing additional case law, and otherwise making resolution of those issues oppressively expensive and burdensome while never actually supplementing their production. While conferring is one thing, it should not become a full-time job to try to get discovery in a single case. Undersigned counsel would have to clear her docket completely to have the time needed to try to convince Defendants to produce discovery in this case, and would have to waive clear rights, such as the right to have unmodified evidence, to ever get anywhere.

Plaintiff hasn't even started depositions and just the discovery disputes in this case have already cost nearly $40,000. It is unclear whether Plaintiff even has the evidence she should have because all attempts to resolve issues are met with misrepresentations and invitations to continue, negotiating, including legal citations, and endless conferences, without ever actually getting the discovery in question. Undersigned counsel has never had so many conferences and

15

hearings about discovery in any other case, and to end up with so many questions about what is actually out there is unacceptable.

## CONCLUSION

Plaintiff respectfully requests that this Court compel Defendants to immediately produce all requested records in their native format with preserved metadata, and to full disclose any and all insurance policies which Defendants are party to and which may pay any portion of a judgment and/or settlement of this case, as they are already required to do.  She requests an order to show cause as to why Defendants have intentionally obstructed Plaintiff's discovery by producing 10's of thousands of pages of irrelevant discovery, including unnecessarily producing and disclosing the private education information of children as an obstructive tactic.  This Court should also enter an order to show cause for repeatedly misrepresenting the nature, basis, scope and outcome of their searches and the form of evidence to intentionally manipulate the Court's decisions based on false information.  Finally, Plaintiff requests that this Court grant her costs and fees for any and all discovery disputes which would not have been necessary had Defendants acted in good faith, including the briefing of the instant motion and the confidentiality order which was wholly unnecessary, and for any and all other relief this Court finds proper.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505

16

(505) 428-9424
heather@hburkelaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed to be served upon opposing counsel of record through the Court's efile and serve system on this 13th day of March, 2025.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com

17